HULL *v.* HULL.

INSURANCE—LIFE INSURANCE—CHANGE OF BENEFICIARIES—ASSIGN-
MENTS—ESTOPPEL.

Where insured indorsed upon forms furnished for that pur-
pose · by the insurer a change of beneficiaries in life in-
surance policies from his daughters to his wife, but failed
to send the certificates to the company in time to have
the transfer completed before his death, and the daugh-
ters expressed a desire to the agent of insurer to have the
money paid to the wife in accordance with the intention
of insured, and voluntarily assigned said policies to her,
a bill by them to enjoin the wife from disposing of the
proceeds of the policies was properly dismissed.

Appeal from Wayne; Webster, J. Submitted Octo-
ber 11, 1918. (Docket No. 37.) Decided February
7, 1919.

Bill by Evelyn R. Hull and another against Marie
Hull and another to enjoin the disposal of the pro-
ceeds of certain policies of insurance, and for an ac-
counting. From a decree dismissing the bill, plain-
tiffs appeal. Affirmed.

*J. O. Murfin* and *Harold McIntyre,* for plaintiffs.

*Lodge & Brown,* for defendants.

MOORE, J. This litigation arises over the proceeds
of two policies of insurance upon the life of the father
of the plaintiffs, issued to him October, 1898.

At the beginning of the trial the following occurred:

"*Mr. Lodge:* Cannot we stipulate that on or about
the 4th day of December, 1898, two policies for $2,000
each were issued to Frank W. Hull by the Bankers
Life Association, which provided for the payment, in
the event of his death, to Emma Hull, his wife, of
the amounts of the two policies; that subsequently his

See notes in 34 L. R. A. (N. S.) 277; L. R. A. 1915A, 580.

wife, Emma Hull, died and thereafter Frank W. Hull made a change of the beneficiary by which one of the policies was made payable to Ethel F. Hull and the other to Evelyn R. Hull, plaintiffs in this case; that subsequently Frank W. Hull married Marie Hull, defendant, by whom he had three children and the five lived together prior to the time of his death as one family; that shortly prior to his death he began to take steps to change the beneficiary in the policies from Ethel and Evelyn, his daughters, to Marie, his wife. He did this first by writing on the 18th of April to the insurer asking for two blanks for change of beneficiaries. That on the 20th of April the insurer wrote him a letter saying that under their rules it was necessary that they have the name and relationship of the proposed beneficiary before supplying the blank, and asked him to give them that information. That on the 28th of April, 1916, he indorsed upon each of the forms a change of beneficiary: 'I, Frank W. Hull, holder of the within certificate,' giving the number, 'hereby revoke all directions by me heretofore made as to the disposition of the benefits accruing thereunder and now direct that the said benefits shall be paid to Marie Hull, bearing to me the relation of wife'; that those were dated and witnessed and sent on to the company and the company, by letter dated May 3, 1916, acknowledged receipt of the forms; that they had recently mailed him with a view to a change of beneficiary and said:

"'But you failed to send us the certificates themselves in accordance with instructions. We are therefore unable to complete the change at this time, but are inclosing a new set of blanks. An exact copy of these blanks should be written upon the back of your certificate of membership or policies, after which the printed instructions are to be carefully followed, both the certificates and inclosed forms being mailed to this office for our stamp of approval. If a copy of the forms which you sent us has been already indorsed upon your certificates all that will be necessary is for you to mail the certificates to this office for the completion of the change.'

"Those are the certificates upon which he indorsed on the 28th of April this change of beneficiary; that the certificates were subsequently sent to the company

and the money has been paid under circumstances which I will leave you to show. We can save a lot of time by stipulating these facts.

"*Mr. Murfin:* I think counsel has stated them correctly. I will make one suggestion: proper proof of loss was furnished the company."

The certificates themselves, though duly indorsed, were not sent to the company until after the death of Mr. Hull.

Testimony was taken as to the circumstances under which the money was paid to the defendant Marie Hull, and the trial judge made a decree dismissing the bill of complaint. The case is brought here by appeal.

We quote from the brief of appellant:

"There are two questions presented in this case:

"(1) As a matter of law had the late Frank W. Hull changed the beneficiary in these two policies so that the defendant was entitled to the proceeds of these policies?

"(2) If he had not, under the facts as disclosed, did the plaintiffs make a free and voluntary gift of this sum of money to their stepmother?"

The first of these questions, in view of the fact that the insurance company is not denying liability, presents a very interesting question. See *Grand Lodge A. O. U. W.* v. *Brown,* 160 Mich. at p. 448; *Ladies of Modern Maccabees* v. *Daley,* 166 Mich. 542, and the many cases there cited. We do not need to base a decision wholly upon the first question, but upon both of them, in the light of what is shown by the record.

After the death of Mr. Hull the insurer was notified and a claim was made for the insurance. This resulted in an invitation to the two plaintiffs and Marie Hull to visit the office of the Detroit representative of the insurance company. Ethel Hull and her stepmother visited the office and a letter was read to them from the home office to the Detroit office. Unfortunately this letter does not appear in the record, but

enough does appear to show that the company in the letter recognized its liability and was willing to pay as soon as it could be protected. We quote some of the testimony as to what occurred at the office. We quote from the testimony of the manager:

"That is the letter that I read to those two. I advised them to get together on the matter and then I was informed that it was the wish of the young ladies, the daughters, that the widow should have the money. That is my memory of the conversation. 'Well, then,' I said, 'I think it can be easily fixed up by your signing an order on the company to pay this to Mrs. Hull,' and the young lady said that it would be all right.

"*Q.* Just look that over and see if you recognize the assignment.

"*Witness:* Yes, that is the one that was signed. The young lady, Miss Ethel Hull, I think it was, yes, signed it in my presence and witnessed by me and by Mrs. Haggerty, cashier. She said she would take it to her sister for her signature, and I do not remember whether it came back to me or was sent direct."

We quote from the testimony of Mrs. Haggerty, the cashier, as follows:

"I was in my office when Ethel Hull and her mother came in and they came up to the wicket and spoke to me. * * * I brought out the letter from the home office advising that the change of beneficiary had not been completed. I got that letter out. I read it off; Mrs. Hull, and Miss Hull, I think, said—I told them that they would have to come to some settlement as to whom the claim would have to be paid to, and Miss Hull spoke and said: 'Father intended that it should be paid to mother, and we want it that way.' And I says, 'Will your sister be willing to sign off her claim?' She said, 'I know she will; we have talked it over. I know that she is willing,' and then—I was still talking to them, when Mr. Strong came into the office, and I introduced them to him and he took them into his room then and he read the letter over to them so that they fully understood it. The letter was read to them twice."

We quote from the testimony of Miss McHugh:

"Ethel came in to get me to witness Evelyn's signature for turning over the insurance to Mrs. Hull, that they were turning over this insurance to Mrs. Hull. I cannot tell the exact words, but they both said they were turning over the insurance to Mrs. Hull, a release from the Bankers Life. Their father had some papers drawn up before he died. That was what was said. I think it was Ethel said that. I don't know for sure—Ethel was there. They both signed this paper to turn their insurance over to their mother.

"*The Court:* What did Ethel say about the father?

"*A.* Her father had some papers drawn up before he died, turning this insurance over, saying that the insurance was to be turned over to their mother.

"*The Court:* Well, what did Ethel say about that?

"*A.* Ethel said that she was willing that she should have it. Evelyn said she was willing the same as Ethel."

The paper which was signed reads as follows:

"DETROIT, MICH., May 15, 1916.

"BANKERS LIFE COMPANY,

"Des Moines, Iowa.

"*Gentlemen:*

"Please pay to Marie Hull, wife of Frank W. Hull, deceased, the full amount due under certificates.

"No. 75786-7.

"ETHEL F. HULL,
"EVELYN HULL,
"Daughters of the Insured."

| Witnesses to signature of Ethel F. Hull | { | J. W. STRONG, AGNES M. HAGGERTY. |
| Witnesses to signature of Evelyn Hull | { | W. H. STEVENSON, MARIE L. MCHUGH. |

When this paper was signed Ethel was upwards of 26 years old and Evelyn was five years younger. The plaintiffs were witnesses and do not seriously dispute the testimony we have quoted. In Ethel's testimony appears the following:

"This letter referred to the matter of the attempts that had been made by my father to change his bene-

ficiary; and after he got through reading the letter to me I knew that my father had attempted to change the beneficiary in the policy from myself and my sister to my stepmother. I don't remember much talk about the matter in the office. Mr. Strong did the talking. Mrs. Haggerty did none. My mother didn't do any of it. It was just Mr. Strong then and myself. Outside of keeping house, my mother did not know much, anyway, in regard to business matters. She was ignorant of business matters. She had to be kind of steered in anything in the way of business. I did the steering with reference to this insurance matter—as much as I knew, I did. After Mr. Strong had read the letter and said what he had to say, it was then that I expressed my willingness that this money should be paid to my mother. *  *  *

"I went down when the money was paid over with my mother. And then went with her to the Wayne County Savings Bank and helped her open that account there, and showed her how to deposit the money. I helped her deposit the money in her own name. I don't think that that money has been withdrawn from that day to this. *  *  *

"My father's death was expected for some time. I knew of different things that he did in readiness for his approaching death; he was getting his affairs in order. After he was sure he was going to die, naturally a person would. He did not talk about some of these things to me. He didn't talk about sending for me to see about getting a title to the house down here. I never talked with him about the contract for the house running to him and his former wife, Emma. I never heard him talk about those things. I was home during his last illness in the evenings. My mother did not suggest that this money be paid to her. Why, no one suggested it, not even the insurance man down there."

It should be stated that both plaintiffs testified that they did not suppose that by signing the paper they lost all right to the insurance money.

We have purposely avoided quoting from the testimony of Marie Hull.

There is no claim by the plaintiffs that any one brought any pressure to bear upon them to induce them to sign the paper. One cannot read this record without being impressed with the idea that the plaintiffs knew of the desire of their father to have his wife, the mother of his three little children, have the insurance, and were willing to give his attempt to bring about that result practical effect. We think they willingly and voluntarily signed the order drawn by Mr. Strong.

The decree of the court below is affirmed, with costs.

BIRD, C. J., and OSTRANDER, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.